**Affirmed and Memorandum Opinion filed December 29, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00503-CV

---

### IN THE INTEREST OF S.W.W., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2019-04540J**

---

## MEMORANDUM OPINION

The trial court terminated a father's parental rights to his ten-year-old son, S.W.W. ("Sam"), on predicate grounds of endangering conduct and failure to comply with a family service plan. The court also found that termination was in Sam's best interest and appointed the Department of Family and Protective Services (the "Department") as Sam's sole managing conservator. On appeal, the father challenges the legal and factual sufficiency of the evidence to support the predicate grounds, as well as the best interest finding, and he also challenges the admissibility of certain drug test results. Because we conclude that legally and factually sufficient evidence supports the trial court's endangerment and best

interest findings, and that appellant has not demonstrated error as to his evidentiary complaint, we affirm the judgment.

## Background

Sam was born on December 16, 2011. Sam's parents ("Mother" and "Father") had another son, Brian, born in September 2009. Mother had a daughter, Diane, born in December 2015; Father was not Diane's biological father, although he considered her his child.[1]

On September 19, 2018, the Department received a referral alleging drug use in the home and that Father was unable to appropriately supervise, protect, and care for Diane. On November 13, 2018, a new intake came in alleging that Father hit Sam, but the allegations of physical abuse were ruled out.

On March 25, 2019, Father submitted to a random urine analysis and tested positive for cocaine and marijuana. On December 16, 2019, Father submitted to a random hair follicle drug screening and tested positive for amphetamines, methamphetamine, cocaine, benzoylecgonine, cocaethylene, and cocaine metabolite.

On December 27, 2019, Brian, Sam, and Diane were removed from Father's care pursuant to an emergency order for protection that named the Department the children's temporary sole managing conservator. The Department's caseworker, Ashley Williams, submitted a removal affidavit and averred that the Department sought to remove all three children—Brian, Sam, and Diane—from Father's care due to Father's inability to provide a drug-free home environment, lack of consistent participation in Family Based Safety Services, and continued drug use. The family had been participating in Family Based Safety Services since April

---

[1] "Sam," "Brian," and "Diane" are pseudonyms. *See* Tex. R. App. P. 9.8.

2

2019. Despite completing drug-related services twice, Father continued to test positive for illegal substances. Based on Father's December 2019 drug test, the Department was concerned that not only was Father continuing to engage in drug use but that he had "escalated" to using new illegal substances while in treatment. Father could not provide any viable placements for the children outside of the home. Mother's whereabouts were unknown at the time of removal.

The removal affidavit included Father's criminal history, which showed charges for assault in 1995, drug possession in 1996, 1997, 2004, 2006, 2007, and 2015, and driving with an invalid license in 2004, 2007, and 2014. The affidavit also detailed the results of Father's drug tests performed before removal, many of which showed positive results for cocaine, marijuana, amphetamines, and methamphetamine.

The affidavit also included the family's CPS history. From December 2017 to August 2018, when Sam was approximately six years old, the Department investigated Mother and Father for neglectful supervision. The allegations were that Mother and Father exposed the children to drug use. Mother and Father used drugs and alcohol while caring for the young children. The children also were "often exposed" to domestic violence by Mother and Father and were exposed "to situations that require judgement beyond their maturity." The home was infested with fleas, resulting in rashes and skin irritations on the children. Mother tested positive for methamphetamine and Father tested positive for cocaine. The Department ruled the investigation as "Reason to Believe."

The Department filed a petition to terminate the parental rights of Mother and Father. The trial on the Department's petition began briefly on January 27, 2022, then recessed to allow Father more time to complete his services, and resumed on May 2, 2022. Mother did not appear at trial and has not appealed the

order terminating her parental rights. The following evidence was presented at trial regarding Sam, who was ten years old at the time of trial and who is the only subject child of this appeal.[2]

Department caseworker LaToya Townsend testified regarding the referral and removal. According to Townsend, the Department had information that when the children came into care, the parents' house was "not up to par" and "[t]here was drug paraphernalia out."

A service plan was created for Father and was adopted by court order. Per the plan, Father completed his parenting classes, his substance abuse assessment, a psychological evaluation, individual counseling, and individual substance abuse counseling, and he provided proof of housing and income. Townsend agreed that the plan also required Father to "maintain a clean and sober lifestyle." However, drug test results admitted during trial showed that Father regularly tested positive for illegal drugs from 2017 (pre-removal) through the time of trial in 2022.

Although Father successfully completed substance abuse counseling by December 2020, he later went back into outpatient counseling and had four sessions to complete, as of the time of trial in May 2022. According to Townsend, Father requested to go back into substance abuse counseling in November 2021: "He stated that he wanted help for his addiction. He actually asked for inpatient. When I offered him the inpatient, he stated that that would conflict with his work, so then we put him back in outpatient counseling."

The trial was continued in January 2022 to allow Father to complete his services. In May 2022 when trial resumed, the Department was concerned that he

---

[2] During this case, Father signed a mediated settlement agreement naming the Department Brian's permanent managing conservator and Father as possessory conservator. Father is not Diane's biological father and therefore had no parental rights to that child that were subject to termination.

4

still had four classes to complete. Townsend had not received weekly attendance notes regarding Father's attendance at AA and NA, nor proof of a sponsor. In Townsend's opinion, Father's drug use posed a danger to the children, specifically in the form of neglect. Townsend believed that the children needed someone who "won't be under the influence that could possibly cause them further hurt, harm, or danger." When asked to be more specific, Townsend testified that the children had to be placed with relatives after removal, and those relatives caused "further abuse to them." So, in Townsend's view, if Father could not stay sober enough to take care of the children, they "could be put in the hands of someone else that can hurt them." Father did not have a support system, and the Department was concerned that, if Sam was returned to Father and Father continued to use drugs, then Sam could "end up back in care."

Father admitted to Townsend that he used cocaine. Townsend testified that a parent using cocaine is not a healthy environment for a child. Townsend believed that, even if Father was not using drugs in front of the children, it still posed a danger to the children: "I mean, he could OD [overdose,] then what?" She also said that it was not a healthy environment for children to be with a parent "who can basically disappear for three months."

Father was absent from Sam's life from December 2021 until March 2022, and Townsend was unable to make contact with Father during that time. Father contended he had COVID during that time period, but Townsend never received any documentary proof of such a diagnosis. Father missed at least five visits during that time. When Father was absent, Sam started showing aggression in the foster home: "[J]ust outbursts. He would break out and cry."

At the time of trial, Sam and Diane were in the same foster home and had been there since November 2021. Sam and Diane had always lived together and

were well bonded. The foster parents were willing to adopt both Sam and Diane, which aligned with the Department's preference that Sam and Diane stay together. For Sam and Diane, the potential adoptive parents told Townsend that "they would work out a visitation plan between the children and Father." The Department previously considered placing Sam and Diane with their maternal grandfather in Montana, but the grandfather said that "he felt as though the kids were here in a good place and they were having visitations with their father, so he did not want to interrupt that for the kids."

According to Townsend, Father had not done "anything that would get the children moving forward out of foster care." The impact from being in foster care caused Sam to have issues with "depression, outbursts, sadness. . . . [H]e felt abandoned." However, Townsend saw a difference in Sam since being in foster care. Sam saw a therapist to work "though the disappointment of [Father] not showing up," and his foster placement worked with him "as far as working through the issues of, basically, being abandoned by [his] parents." By the time of trial, the foster family was "doing a lot of family things that . . . lifted [Sam's] moral[e]. [Sam and Diane were] just really happier kids now." Townsend said that Sam was thriving in his current placement.

Townsend acknowledged that Father is "a decent guy," who was pleasant and cooperative with her. She had no doubt that he loved his children. His visits with the children went well. It was clear that he was very bonded with his children, and the children were bonded with him. Townsend testified that Father was employed and had an appropriate place to live with adequate room for the children. She agreed that Father expressed a willingness to get help for his drug abuse problems. However, Townsend believed it was in Sam's best interest for Father's parental rights to be terminated.

Father testified. When asked "isn't it true that you have continued to use drugs in spite of completing some of your services," Father answered, "Yes." According to Father, he was "triggered to use . . . by the court." Father said he requested additional counseling but could not go on an inpatient basis because he would be unable to work and would lose his apartment and everything he had. According to Father, he had not completed his last four counseling classes because he did not have direct contact with his counselor. Father admitted that it was not a "good idea" to parent while testing positive for cocaine. Father's "drug of choice" was cocaine, but he only "dibble[d] and dabble[d]" in drugs; he was not an "everyday user." He "probably" last used drugs in December 2021. He agreed that buying cocaine "[f]rom a guy's house" was a dangerous thing to do.

Father went to AA meetings "once a week or twice a week," and was in the process of getting a new sponsor. Father knew that he was supposed to send his AA and NA attendance records to Townsend but admitted that he did not. He was "open and honest" with the Department about his desire to get help for his drug addiction, which started in 2002 after a workplace injury.

Father denied that he was not in contact with Townsend during December 2021 to March 2022. He testified that he told her each time before missing a visit, because he still felt sick. According to Father, he had COVID for seven weeks.

Father testified that he worked forty hours a week on "overhead doors and gates" for employment. He lived in a two-bedroom apartment, and he still had some of the children's belongings there.

Father loved his children: "They're all my heart. All I got. That's my only family." He did not want his rights terminated because he wanted to continue being in their lives. Father never paid child support but testified that he was never ordered to do so. He bought them clothes and Christmas gifts.

7

Father admitted that he had not done everything he could to get the children out of foster care.

Erin Orozco with Child Advocates was one of the guardians ad litem in the case. The children were doing well in their placements. When Father cancelled visits, Sam expressed "that it was difficult not seeing his father for a while and then being able to see him and then not being able to." Orozco acknowledged that there was a bond between Father and the children, but she agreed with the Department's recommendation of terminating Father's parental rights to Sam and that doing so was in Sam's best interest. Sam's current placement was willing to continue sibling visits with Brian.

Lynna Dizon, the other guardian ad litem, testified that "[a]ll three children love their father, and they love to visit with him. So I don't think that's even in dispute about that bond." She nonetheless had concerns because "there comes a time when the children's best interest has to come first. And they really do need permanency. . . . [Sam had] lingered in foster care for over two years." She said that Father was not willing to go into inpatient treatment but without inpatient treatment, Dizon did not believe any changes would be made: "They haven't been made up to now."

Dizon spoke with Sam and Diane "in an appropriate developmental manner" about the possibility of termination. They understood that their father would no longer be making any decisions for them and that their adoptive parents would be making all decisions for them, such as who they could and could not have contact with, including their father.

Dizon believed the foster family could provide a safe and stable environment for Sam and Diane. The children had adjusted to their foster family and "just

8

want[ed] to be in a stable placement." Dizon believed that the three months that Father was absent "just did a lot of damage to all three children."

Trial recessed again for a few weeks. When it resumed, Father's attorney recalled Townsend and asked Townsend if she had "any real concerns about [Father's] ability as a parent." Townsend initially answered, "No," but then said, "The fact that he has the issue with the substance [abuse], and he's also, throughout the case, [] taken [a] very long period of disappearing acts from the kids." She further stated that the Department was concerned that his "continued drug use will inhibit his parenting." Townsend also stated that Father had switched providers for his substance abuse counseling but still had not completed all necessary classes. When Townsend reached out to the new provider, "no one reached back out to [her] explaining to [her] how this would be paid for. . . . But he did not successfully complete the substance abuse [classes]," which was still a concern for the Department.

Father also testified again. He testified that, at a recent visit, Sam said, "I don't want to lose you, Dad."

Sam's foster mother testified. She and her husband were both educators. She taught music in an elementary school, and he was a junior high science teacher. They had one adopted child, who "absolutely adore[d] having siblings." The foster parents had fostered children before where "they haven't always gotten along . . . but [their daughter] does really get along with [Sam]."

Sam and Diane called their foster parents "Mom" and "Dad." Sam had adjusted to being in the foster home. According to Sam's foster mother, Sam indicated that he "want[ed] to stay" with his foster family "forever." Sam talked with his foster parents about the future and was "positive looking forward to the future." His foster mother also said that Sam "mentioned that if he doesn't get to

go back with his dad, that he would like to stay" with his foster family. The foster parents were willing to adopt Sam and were willing to allow him to keep in contact with Father, as long as it was in Sam's best interest. The foster mother said that one of Sam's goals is to be a professional soccer player, so the parents enrolled him in a summer soccer camp and had plans for him to play on a weekly team once school started.

At the conclusion of trial, the trial court found clear and convincing evidence that Father engaged in conduct that endangered Sam's physical or emotional well-being and that Father did not comply with the provisions of a court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O). The court further found that terminating Father's parental rights was in Sam's best interest and appointed the Department Sam's permanent managing conservator. *See id.* §§ 161.001(b)(2), 161.207(a). Based on these findings, the trial court signed a final order terminating Father's parental rights to Sam.

Father timely appealed.

**Analysis**

Father presents four issues for review. First, he challenges the admission of his drug test results. In his second and third issues, he challenges the legal and factual sufficiency of the evidence to support the predicate grounds for termination—endangerment and failure to comply with the court-ordered service plan. Finally, Father argues in his fourth issue that the evidence is legally and factually insufficient to support the best interest finding.

**A.    Standards of Review**

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing

evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). *See* Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re of J.F.-G.*, 627 S.W.3d 304, 310 (Tex. 2021); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.— Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *See In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.-G.*, 627 S.W.3d at 310; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.— Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the challenged finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that the finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of the finding if a reasonable fact finder could do so, and we disregard all evidence

that a reasonable fact finder could have disbelieved. *See id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (internal quotation omitted). We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

We review a trial court's admission of evidence under the familiar abuse-of-discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

## B.     Admission of Evidence

In his first issue, Father argues that the trial court abused its discretion in admitting drug test results that lacked sufficient indicia of their reliability and trustworthiness. At trial, Father objected to the admission of Exhibits 10 through 17, all of which were drug test results. We note that Exhibits 11 and 17 were drug

12

test results for Mother, not Father, and so Father's complaint is moot as to those exhibits. Exhibits 10 and 16 were results of tests performed by the National Screening Center, and the remaining exhibits (12-15) were results of tests performed by the Texas Alcohol and Drug Testing Service. The exhibits show positive test results for one or more of cocaine, amphetamines, methamphetamine, and marijuana, for the following time periods: November 2017; May 2018; March, April, June, August, and December 2019; January, February, May, and September 2020; January, May, and September 2021; and March and April 2022. The exhibits also show negative results for the following time periods: March, April, June, and July 2018; July and October 2019; June, July, August, October, November, and December 2020; and June 2021.

The testing records were accompanied by a business records affidavit signed by the custodian of records for each testing company. The affidavits generally tracked the language of Texas Rule of Evidence 803(6), which sets out the requirements for the hearsay exception for records of regularly conducted business activity, and Rule 902(10), which sets out the requirements for authentication purposes of an affidavit that accompanies business records. *See* Tex. R. Evid. 803(6), 902(10).

Because the test results were accompanied by affidavits that complied with Rule of Evidence 902(10)(B), "the only question" regarding admissibility was "whether the drug test result[s] showed sufficient indicia of trustworthiness" to bring them within the business-records exception to the hearsay rule. *F.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *6 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.); *see also* Tex. R. Evid. 803(6)(E) (records of regularly conducted activity are not excluded by hearsay rule if, among other criteria, the opponent fails to demonstrate that the source of

13

information or the method or circumstances of preparation indicate a lack of trustworthiness).

The affiants averred, in similar language, that the drug tests followed standard chain of custody procedures, were performed utilizing GC/MS (gas chromatography/mass spectrometry) or LC/MS (liquid chromatography/mass spectrometry) instruments, and were reviewed by a certified scientist or licensed medical review officer. Each affidavit further provided that a record of the test result was kept in the regular course of business of the National Screening Center or Texas Alcohol and Drug Testing Service and that it was in the regular course of business of those respective entities for an employee or representative with knowledge of the act, event, condition, opinion, or diagnosis to record the information at or reasonably near the time it occurred. The drug tests performed by the Texas Alcohol and Drug Testing Service were each signed by a certified medical review officer, an MD, verifying that the test was positive. All test result documents identified the collection site, date, type of panel test used, and name of the lab that performed the test. Each exhibit included one or more laboratory reports indicating the quantitative test results and identifying the testing lab as "DHHS Certified." The tests performed by the Texas Alcohol and Drug Testing Service included a "Forensic Drug Testing Custody and Control Form" that accompanied the samples Father provided. We conclude that the trial court did not abuse its discretion in determining that the drug test results and accompanying affidavits showed sufficient indicia of trustworthiness. *See F.C.*, 2020 WL 101998, at *6.

Father did not demonstrate that the challenged records lacked trustworthiness. He argued that the results necessitated testimony from an expert, but we have consistently rejected that argument. *See In re Z.N.M.*, No. 14-17-

14

00650-CV, 2018 WL 358480, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.) (rejecting the argument that an expert was necessary to interpret drug testing results); *In re B.F.*, No. 14-17-00421-CV, 2017 WL 5505821, at *7 (Tex. App.—Houston [14th Dist.] Nov. 16, 2017, no pet.) (mem. op.) (same); *In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 WL 1719133, at *10 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) (mem. op.) (same).

Father relies on *In re K.C.P.*, in which the Texarkana Court of Appeals held that drug test results were improperly admitted as exhibits under the business-records exception in a termination case because they indicated a lack of trustworthiness where the affidavit contained "no information as to the qualifications of the person or the equipment used, the method of administering the test, and whether the test was a standard one for the particular substance." *In re K.C.P.*, 142 S.W.3d 574, 580 (Tex. App.—Texarkana 2004, no pet.).

Father does not cite any authority from this court where we agreed with and followed the holding in *In re K.C.P.* Furthermore, *In re K.C.P.* is factually distinguishable; as just discussed, the test results and accompanying affidavits here showed sufficient indicia of trustworthiness because they contained information regarding, among other things, the chain of custody, the testing procedures utilized, and the qualifications of the analysts. *See, e.g.*, *In re E.B.*, No. 11-19-00001-CV, 2019 WL 3955974, at *3 (Tex. App.—Eastland Aug. 22, 2019, no pet.) (mem. op.).

We conclude that the trial court did not abuse its discretion in determining that the drug tests and accompanying affidavits in Exhibits 10 and 12 through 16 showed sufficient indicia of trustworthiness to be properly admitted as business records. *See F.C.*, 2020 WL 101998, at *6 (court did not abuse its discretion in admitting test results accompanied by business-records affidavit).

Father separately challenges the admission of Exhibit 15 for the additional reason that the Department did not serve Father with the exhibit at least fourteen days before trial began on January 27, 2022, in violation of Rule 902. *See* Tex. R. Evid. 902(10)(A) ("The proponent of a record must serve the record and the accompanying affidavit on each other party to the case at least 14 days before trial."). Father's challenge is without merit. As the Department points out, "[f]or good cause shown, the court may order that a business record be treated as presumptively authentic even if the proponent fails to comply with subparagraph (A)." Tex. R. Evid. 902(10).

Exhibit 15 was the result of Father's drug test performed on April 7, 2022. The Department served it to Father's counsel on April 28, 2022. Father objected to admission of Exhibit 15 during the continued trial, on May 2, 2022. The Department could not have served it more than fourteen days before trial began on January 27, 2022, a fact the Department pointed out to the trial court in response to Father's objection: "And here, Judge, the good cause would be that [Father] was ordered to test at the last hearing that we were in. We had -- trial has commenced and the business record affidavit was filed with the Court as soon as it was received." We hold that the trial court did not abuse its discretion in admitting Exhibit 15. *See id.*

We overrule Father's first issue.

**B.      Predicate Grounds**

In his second and third issues, Father argues the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(E) and (O) predicate grounds on which the termination order is based.

1. *Applicable law*

To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E), "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d at 237. Thus, when as here a parent challenges predicate termination grounds under subsection 161.001(b)(1)(E), we must address and detail our analysis under one of those subsections. *See id.* We will address the trial court's finding of endangerment under subsection (E).

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best interest finding, that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* Relevant

evidence in determining whether a parent engaged in a course of endangering conduct includes conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *See In re J.O.A.*, 283 S.W.3d at 345.

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738-39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92. Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *See In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.); *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being. *See Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

2.     *Analysis*

The record contains clear and convincing evidence that Father regularly engaged in criminal activity, namely the routine abuse of illegal drugs. The removal affidavit, which was admitted into evidence as part of an exhibit, detailed his positive test results prior to Sam's removal, as well as criminal possession

charges. Father admitted to his drug use. Father continued to regularly use illegal drugs after Sam was removed and throughout the pendency of this case, as shown by his numerous positive drug test results. Thus, Father subjected Sam to an early life of uncertainty and instability because Father could be jailed for drug-related offenses. *See In re L.G.*, No. 14-22-00335-CV, 2022 11572541, at *10 (Tex. App.—Houston [14th Dist.] Oct. 20, 2022, no pet. h.) (mem. op.).

Further, the court reasonably could have believed that Father's three-month absence from Sam's life, starting in December 2021 and continuing until March 2022, was due to a relapse of drug use. Although Father claimed he had COVID during that entire period, the fact finder was not required to believe his excuse. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam) (fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses). The trial court could reasonably infer that Father's absence was drug-related, especially since the record shows that Father used drugs both immediately before and immediately after the absence; he admitted to using drugs in December 2021 and tested positive for cocaine in April 2022. Father missed five visits during his three-month absence, and Townsend testified that Sam exhibited signs of aggression, outbursts, and crying when Father disappeared. Father's actions, including exposing Sam to the possibility of being left alone, supports the finding that Father knowingly placed Sam in conditions or surroundings that endangered his physical or emotional well-being. *See In re C.W.M.P.*, No. 14-20-00571-CV, 2021 WL 244865, at *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2021, pet. denied) (mem. op.) ("Mother also missed approximately four or five visits with Charlie. This evidence shows that Mother has not made a conscientious effort to maintain her parental relationship with Charlie" and was properly considered in endangerment analysis); *In re A.R.M.*, 593 S.W.3d 358, 371-72 (Tex. App.—Dallas 2018, pet.

denied) ("missed visits with the child" relevant to an endangerment finding under subsection (E)).

We have held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing the child, may support a finding to a clear and convincing degree that the parent engaged in conduct that endangered the child's physical or emotional wellbeing. *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *6 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.). But we have also held that there must be a causal connection between a parent's drug use and any alleged endangerment. *In re L.C.L.*, 599 S.W.3d 79, 84 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc). Father relies on *In re L.C.L.* to argue that there was "no evidence in this trial record" establishing such a causal connection between Father's drug use and Sam's endangerment.

*In re L.C.L.* is distinguishable. In that case, the sole basis for termination was that the mother "tested positive for drugs both initially and throughout the proceedings." *Id.* Here, there are more factors. Not only did Father repeatedly test positive for illegal drugs, but the removal affidavit made clear that Father's drug use contributed to an unstable and dangerous living situation. The Department found "Reason to Believe" that, prior to removal, Father used drugs while caring for Sam and his siblings, who were "infested with fleas" and had skin irritations. Townsend testified that, at the time the children came into the Department's care, Father's house "was not up to par. There was drug paraphernalia out." The removal affidavit also referenced a history of domestic violence in the home between Mother and Father. This evidence supports a reasonable finding that Father had a long history of drug use and unstable living conditions that endangered Sam and that Father would continue to engage in such

20

behavior. *See In re E.A.D.*, No. 14-22-00025-CV, 2022 WL 2663981, at \*6-7 (Tex. App.—Houston [14th Dist.] July 11, 2022, no pet.) (mem. op.) (evidence supported finding that mother had history of drug use, neglect, and unstable living conditions that endangered the children and would continue to engage in such behavior); *In re A.W.*, No. 14-20-00492-CV, 2020 WL 7068131, at \*7 (Tex. App.—Houston [14th Dist.] Dec. 3, 2020, pet. denied) (mem. op.) (evidence of mother's family violence, absence from the children's lives both before and after removal, and inability to provide a stable home and appropriate care for the children, including inability to care for the children due to her drug use and untreated mental-health issues, would allow the fact finder to form a firm belief or conviction that mother engaged in an endangering course of conduct).

Based on all the foregoing evidence, we conclude that a fact finder could have formed a firm belief or conviction that its endangerment finding under subsection (E) was true. In sum, considered in the light most favorable to the trial court's ruling, we conclude that the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights to Sam was justified under Family Code section 161.001(b)(1)(E). *See In re E.A.D.*, 2022 WL 2663981, at \*7. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude that the evidence is legally and factually sufficient to support the subsection (E) finding.

Having concluded that the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsection (O) finding. We overrule Father's second issue and do not reach his third issue.

## C.     Best Interest

In Father's fourth issue, he challenges the legal and factual sufficiency of the evidence to support the trial court's best interest finding.

### 1.     *Applicable law*

The best interest inquiry is child-centered and focuses on the child's well-being, safety, and development.  *In re A.C.*, 560 S.W.3d at 631.  The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions.  *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (the "*Holley* factors"); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption.  *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.— Houston [14th Dist.] 2012, no pet.).  Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest.  Tex. Fam. Code § 263.307(a).  A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors.  *See Holley*,

544 S.W.2d at 371-72. Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28. And a fact finder may measure a parent's future conduct by his past conduct in determining whether termination of parental rights is in the child's best interest. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

2.  *Application*

We review the *Holley* factors in light of the evidence at trial. Regarding Sam's desires, Father testified that Sam told Father, "I don't want to lose you." On the other hand, Sam's foster mother testified that he told her he wanted to stay with his foster family "forever" and that he envisioned a future with them. The foster mother also testified that Sam was very bonded to his foster parents and foster sibling, as well as to his own sister, Diane, whom the foster family also planned to adopt. The foster mother expressed a willingness to continue sibling visits with Brian, as well as visits with Father. The evidence established that the foster home was a stable placement and Sam had adjusted to living there. Although there was evidence that Sam and Father shared a close bond, on balance, *Holley* factors 1, 4, and 7 weigh in favor of termination.

The evidence showed that Father had a long history of drug abuse. Father testified that he sought help for his drug addiction with "varying degrees of success." The exhibits documenting Father's drug tests show occasional negative results. But even if Father was sober at various times during Sam's life and the pendency of this case, he also admitted to using drugs again in December 2021, after which he disappeared from Sam's life for three months and missed at least five visits. Although he attributes this absence to a months-long COVID diagnosis, the trial court could have disbelieved that excuse. *See In re H.R.M.*, 209

23

S.W.3d at 109. Father's absence caused Sam emotional distress and confusion. The evidence of Father's extensive drug abuse, which is relevant to *Holley* factors 2, 3, and 8, weighs in favor of the trial court's finding.

Father successfully obtained appropriate housing and was employed at the time of trial. He testified that he was never ordered to pay child support, but that he bought the children clothes and presents. All witnesses agreed that Father loved and was bonded to Sam. And Father had successfully completed and later re-enrolled in a drug counseling program in an effort to curb his drug addiction. Thus, the evidence showed that Father was willing to make positive changes in his own life and his environment. However, Father had not maintained sobriety for a significant time, which was in violation of his family service plan, and did not have a support system to assist him with raising Sam. On balance, the evidence, which is relevant to *Holley* factors 4, 5, and 6, weighs in favor the trial court's finding.

We conclude that there is legally and factually sufficient evidence to support the trial court's finding that termination was in Sam's best interest. Although Father expressed love for his son and claimed he could provide a stable home appropriate for Sam, the Department's caseworker testified that Father's "continued drug use will inhibit his parenting." Based on Father's inability to achieve and maintain sobriety, the trial court reasonably could have found that Father's parental abilities weighed in favor of finding termination was in Sam's best interest. *See In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a

24

firm belief or conviction that termination of Father's parental rights was in Sam's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

## Conclusion

Having overruled all dispositive issues in this appeal, we affirm the trial court's judgment.


/s/ Kevin Jewell
Justice


Panel consists of Justices Wise, Jewell, and Poissant.